# In the United States Court of Federal Claims

No. 21-1394C
(Filed: September 23, 2021)
(Re-Filed: November 10, 2021)[1]

* * * * * * * * * * * * * * * * * * * *

INTUITIVE RESEARCH AND
TECHNOLOGY CORPORATION,

      *Plaintiffs,*

v.

THE UNITED STATES,

      *Defendant*

and

BOOZ ALLEN HAMILTON INC.,

      *Intervenor.*

Bid protest; post-award bid protest; price realism; unstated evaluation criteria; unequal treatment; best value determination

* * * * * * * * * * * * * * * * * * * *

    *Jon D. Levin*, Huntsville, AL, for plaintiff, with whom was *W. Brad English*, *Emily J. Chancey*, *J. Dale Gipson*, and *Nicholas P. Greer*.

    *Geoffrey M. Long*, Trial Attorney, United States Department of Justice, Civil Division, with whom were *Brian M. Boynton*, Acting Assistant Attorney General, *Martin F. Hockey, Jr.*, Acting Director, and *Elizabeth M. Hosford*, Assistant Director, for defendant. *Philip Aubart* and *Benjamin H. Jarrell*, United States Army, of counsel.

---

[1] This opinion was originally issued under seal in order to afford the parties an opportunity to propose redactions of protected material. The parties did not propose any reductions; thus it appears in full.

*Gary J. Campbell*, Washington, DC, for intervenor, with whom was *G. Matthew Koehl* and *Lidiya Kurin*, of counsel.

OPINION

This is a bid protest of the Department of the Army's decision to award a task order to Booze Allen Hamilton, Inc. ("intervenor" or "Booze Allen") for technical support services for its Prototype Integration Facility ("PIF"), a unit that provides integration of new technology into weapons systems. The task order was issued on a best value basis pursuant to a Department of Defense ("DOD") blanket purchase agreement ("BPA"). Plaintiff complains that the Army applied unstated evaluation criteria and failed to perform a sufficient price realism analysis. The matter is fully briefed on cross-motions for judgment on the administrative record, and oral argument was held on September 3, 2021. Because we find no error in the agency's evaluation, we deny the protest for the reasons set out below.

BACKGROUND

The United States Army Contracting Command ("AMCOM") issued the request for quotations ("RFQ") for the task order at issue on September 25, 2020, which was then twice amended within a month. The RFQ was issued under AMCOM's existing professional and engineering services BPA, known as the EXPRESS BPA. As such, it was subject to the requirements of Federal Acquisition Regulation ("FAR") part 8.405-3. The EXPRESS BPA was between AMCOM and holders of certain General Services Administration Federal Supply Schedule contractors for support, technical, and engineering services. *See* Administrative Record ("AR") 5-6 (Acquisition Strategy EXPRESS Evergreen (Nov. 9, 2016)). This particular task order was classified under the North American Industry Classification System as non-research and development engineering services.

The solicited task order was to be a hybrid of a firm-fixed-price and a time-and-materials contract. The initial Technical Direction would be performed for a fixed price, which coincided with the initial 12-month performance period.[2] The five option years would be priced based on time and materials. In the RFQ, the agency promised to award to the bidder that represented the best value to the government as outlined in Attachment 4 to

---

[2] The initial Technical Direction is a section of the RFQ that contains the background, objectives, and work requirements for the first 12-month performance period of the task order.

the solicitation. That document promised that a tradeoff analysis would be performed by the agency to balance price against technical ratings to arrive at the best value. As is normally the case in best value procurements, this meant that the agency might not award to the lowest priced offeror. Price was the least important factor, but the solicitation warned that its importance would increase "as the differences between the evaluation results for the other criteria decrease." AR 1561.

Attachment 4 to the RFQ promised that award would be based on the Army's consideration of three factors: (1) Technical Expertise, (2) Risk Mitigation and Management, and (3) Price. Technical Expertise and Risk Mitigation were equally important to the agency and were each individually more important than Price. About Price, the agency stated that it "is not expected to be the controlling criterion in the selection, but its importance will increase as the differences between the evaluation results for the other criteria decrease." AR 205.

The RFQ instructed that the first two factors would be rated adjectively with possible scores of Outstanding, Good, Acceptable, or Unacceptable. An Outstanding rating in Technical Expertise meant that the "[q]uotation meets requirements and indicates an exceptional level of expertise and an understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low." AR 206. Similarly, an Outstanding rating in Risk Mitigation and Management meant that the "[q]uotation meets requirements and indicates an exceptional Risk Mitigation and Management approach. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is low." AR 207. Price, meanwhile, would be evaluated "to assess the level of effort and the mix of labor proposed to perform the tasks outlined in the PWS." AR 208. Price would also be evaluated for price reasonableness ("i.e., a price that a prudent businessperson would pay for an item or service under competitive market conditions, given a reasonable knowledge of the marketplace") and price realism ("ensur[ing] the proposed pricing is realistic for the work to be performed, reflects a clear understanding of the requirements, and is consistent with the various elements of the other parts of the quotation"). *Id.*

Plaintiff, Intuitive Research and Technology Corporation ("Intuitive"), and intervenor timely submitted quotations on October 30, 2020. Following their submissions, the government used a five-person Evaluation Team to examine the quotations. The Evaluation Team rated both intervenor and plaintiff as Outstanding in both Technical Expertise and Risk Mitigation and Management. Under Technical Expertise, the Evaluation

Team found that plaintiff had nine strengths, covering five out of eight critical PWS requirements, and intervenor had five strengths, covering four of the eight critical requirements. Under Risk Mitigation and Management, the Evaluation Team found that plaintiff and intervenor had three strengths each.

On March 12, 2021, the contracting officer ("CO") issued a "Best Value and Fair and Reasonable Determination."  AR 1538.  In her determination, the CO first set forth and then summarized the Evaluation Team's analysis of the quotations. She then examined both the plaintiff's and intervenor's proposed pricing schemes, finding them to be reasonable and realistic.

The CO then began her discussion of which quotation presented the best value to the government. The CO first noted that she agreed with all of the Evaluation Team's analyses. The CO next went through, factor-by-factor, each of the offeror's quotations, summarizing their strengths. She noted, once again, that both plaintiff and intervenor received Outstanding ratings in both Technical Expertise and Risk Mitigation and Management. The CO recognized that in the Technical Expertise factor intervenor had five strengths, "exceeding performance capability requirements in four of the eight critical areas of the PWS [Performance Work Statement," while plaintiff had nine strengths, "exceed[ing] specified performance capability requirements in five of the eight critical areas of the PWS." AR 1566. The CO also noted, however, that plaintiff's price was $322,901,764.69 while intervenor's was $291,450,904,76, a difference of 10.8 percent. Ultimately, Price was the distinguishing factor for the CO because, "[a]lthough Price is not the controlling factor, its importance increases as the differences between competing proposals decreases." *Id.* "Despite the differences between [plaintiff's] proposed technical solutions versus [intervenor] . . . the variation in pricing was significant enough in determining [intervenor] as the best value to the government." *Id.* Furthermore, intervenor was "more advantageous to the Government because it was more collaborative, distinctive and efficient solution." *Id.*

Following the award of the task order to intervenor, plaintiff filed an unsuccessful agency-level bid protest with the Army on March 31, 2021. Following the CO's denial of the protest on May 5, 2021, plaintiff filed the present bid protest on May 25, 2021. The government filed the administrative record, and the parties submitted the case on cross-motions for judgment. Oral argument was held September 3, 2021.  We denied plaintiff's motion

and granted defendant's and intervenor's motions by short order on September 7, 2021. Judgment was deferred pending this opinion.

## DISCUSSION

We review bid protests using the standards set forth in the Administrative Procedures Act. *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345,1350–51 (Fed. Cir. 2004). Unless the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," it will remain undisturbed. 5 U.S.C. § 706(2)(A) (2018). Put differently, if the agency's decision was reasonable and not in violation of any law or regulation, it will be upheld. This standard is "highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). Furthermore, any agency's error must have prejudiced the protestor before relief can be considered. *Office Design Grp. v. United States*, 951 F.3d 1366, 1373 (Fed. Cir. 2020) (citing *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013)). "To establish prejudicial error, a protestor must show that but for that error, the protestor had a substantial chance of receiving a contract award." *Id.* at 1373–74 (citing *Alfa Laval Separation, Inc. v. United States* 175 F.3d 1365, 1367 (Fed. Cir. 1999)).

Plaintiff presents multiple bases for its protest. First, plaintiff argues that the agency improperly conducted its price realism analysis. Next, plaintiff claims that the agency applied unstated evaluation criteria when evaluating its quotation. Plaintiff then argues that the agency evaluated the quotations unequally. Finally, plaintiff claims that the agency unreasonably failed to assign strengths to its quotation.[3] Plaintiff claims that the above errors prejudiced it, warranting a permanent injunction against performance of this task order. For the reasons below, we find plaintiff's arguments unavailing.

   I.   The Agency Reasonably Conducted Its Price Realism Analysis

First, plaintiff argues that the CO's determination showed that the agency did not perform a price realism analysis. Plaintiff claims that the only relevant language in the CO's determination was a "high level comment" that:

---

[3] Plaintiff also argues that the agency's tradeoff analysis was arbitrary and irrational, but this assertion largely comprises arguments made and addressed in connection with other arguments.

> The technical evaluation team considered three Offerors' Basis of Estimate to reflect a clear understanding of the requirement and to be consistent with the other parts of the quotations. Upon review of the price quotations and the IGE basis (historical rates and escalation), it is determined that three proposals are realistic for the work to be performed.

AR 1560.  Plaintiff asserts that this lone comment shows that the agency did not perform a price analysis, and if it had, it would have rejected the intervenor's proposal due to performance risks.

To the extent that an analysis was done, plaintiff argues that it was flawed because intervenor's Technical Direction price was unrealistically low and proposed labor mix was insufficient.  Plaintiff claims that the Technical Direction, fixed-price section of the RFQ required a contractor to perform a wide variety of tasks for Configuration Management and Quality Management services.  Under Configuration Management, a contractor would provide "expertise for the centralized planning, direction, and control of configuration management and data management of PIF quality data, documentation, databases, and logs." AR 181. Under Quality Management, a contractor would perform a variety of services, including managing multiple logs, being responsible for customer feedback, and managing PIF metrics and data.  Plaintiff then linked those requirements under the Technical Direction section to a broader set of requirements under the same headings in the PWS.

Plaintiff takes issue with intervenor's proposed division of work requirements.  For the 12,240 firm-fixed-price Technical Direction hours required by the agency, intervenor proposed that an Administrative Specialist and Lead Engineer perform the work with a 75 percent and 25 percent labor hour split at a total price of $970,292.67.  Plaintiff argues that an Administrative Specialist "is not capable of performing [the Technical Direction] tasks or not likely to perform those tasks at the low price paid for the position." Pl.'s Mot. at 17. An Administrative Specialist, according to plaintiff, is essentially a support role, such as a secretary or a clerk, that only requires a high school degree or equivalent.  Plaintiff claims that, based on the contractor's duties under Configuration Management and Quality Management, an Administrative Specialist would not be able to meet Technical Direction's requirements.  Plaintiff also argues that the intervenor's Lead Engineer would not be able to fulfill the Technical Direction's requirements either.  Plaintiff claims that the division of labor

6

hours between the Administrative Specialist and Lead Engineer at intervenor's given price meant that it was not realistic that intervenor could have performed under the task order and that intervenor did not have a clear understanding of the work. Therefore, the agency improperly conducted the price realism analysis, and intervenor should have been eliminated from the competition, says plaintiff.

Defendant presents multiple rebuttals to plaintiff's assertions. First, defendant alleges that plaintiff would not be able to show prejudice from a faulty price realism analysis. According to defendant, the firm-fixed-price Technical Direction aspect of the task order only "comprise[d] 12,240 hours of effort, out of the 3,595,032 total hours of effort proposed by [intervenor]." Def.'s Mot. at 23. The difference in price in the firm-fixed-price element between the two offerors is $515,904.50, as plaintiff's proposal was $1,672,298.50 and intervenor's was $1,156,394. Defendant claims that this difference is far too small to constitute prejudice as it is only 1.6 percent of the difference between the two proposals and 0.2 percent of intervenor's total proposed price. Defendant argues that the 10.8 percent differences in prices would be reduced to 10.6 percent (if intervenor's proposal were hypothetically priced up to match plaintiff's price), which would not have affected the CO's decision and could not have constituted prejudice.

Defendant also argues that the price realism analysis was performed correctly, and that intervenor's price was realistic. Defendant contends that plaintiff misunderstood intervenor's proposal regarding the initial Technical Direction. According to defendant, the initial Technical Direction (the first year of performance under the task order) was to "provide quality management support for aviation and missile activities." AR 180. "The objective was to manage a corrective action log and provide weekly communication to ensure appropriate responses and follow-up activities are performed," and other objectives were to "manage the PIF's Process Deviation Log, organize PIF Customer feedback, and manage quality data using Sharepoint." Def.'s Mot. at 24. Defendant argues that the initial Technical Direction did not encompass all the requirements from the PWS, contrary to plaintiff's understanding.

As it pertains to the merits, we agree with defendant.[4] The initial Technical Direction subsections of the RFQ containing the requirements for Quality and Configuration Management are far narrower than the respective

---

[4] Because we are deciding this issue on the merits, we need not decide the issue of prejudice.

sections in the PWS.  For example, as defendant notes, plaintiff claimed that a part of Configuration Management under the PWS "mandated that the contractor designate a single technical authority with program responsibility to manage all configuration management (including acquisition) and work directly with the Agency's senior configuration manager."  AR 166.  The initial Technical Direction contains no such requirement.  Instead, as described in the initial Technical Direction, the firm-fixed-price section largely consists of simpler tasks, such as managing various logs, organizing information, and ensuring weekly communications.  *See* AR 181.  Intervenor included in its proposal an explanation detailing how an Administrative Specialist and Lead Engineer on a 75-25 percent effort split would perform the initial Technical Direction.  The agency reasonably believed, based on that proposal, that intervenor understood the work and would realistically be able to perform with that personnel at its given price.  Because that determination was reasonable, we will not interfere with the agency's decision.

II. The CO Reasonably Concluded That Intervenor's Proposal Represented the Best Value to the Government

Plaintiff next argues that the CO applied unstated evaluation criteria when making her best value determination.  Plaintiff alleges that the CO awarded the task order to intervenor because she found intervenor's proposal to be "more advantageous to the Government because it was more collaborative, distinctive, and efficient," factors not found in the RFQ.  AR 1566.  Plaintiff further alleges that the government doubled down on this finding, stating in the debrief notice that the intervenor's proposal was "more efficient, transparent, and collaborative."  AR 1670.  Plaintiff argues that none of those "loosey-goosey, business-lite terms" appear in any PWS section and the evaluation board made no findings based on those terms.  Pl.'s Mot. at 9.  Instead, the "Source Selection Authority injected these cut-from-whole-cloth differentiators without mentioning where they came from."  *Id.*

Defendant responds that plaintiff myopically focuses on a single sentence while ignoring the context of the statement and the CO's overall analysis.  The CO followed the best-value tradeoff approach outlined in the RFQ.  Defendant claims that the CO was presented with two Outstanding proposals, and according to the RFQ, while Price was the least important factor, "its importance will increase as the differences between the evaluation results for the other criteria decrease."  AR 1561.  Therefore, although Plaintiff had more strengths and in more critical areas of the PWS than

8

intervenor, "the variation in pricing was significant enough in determining [intervenor] as the best value to the government." AR 1566. Defendant argues that the agency's methodology and analysis is clear, and the focus on this single sentence in the CO's determination is unwarranted. Defendant claims that the sentence can "simply be disregarded, as there is no evidence that its inclusion had any impact on the best-value tradeoff analysis." Def.'s Mot. at 22.

In substance, we agree with defendant. While we cannot ignore the CO's comment, defendant is correct that it appears to be surplusage, which had no impact on her analysis and no role in her decision. It is clear that the CO's decision came down to Price. It is evident throughout the CO's best value determination that she was aware of the offerors' proposals and their relative strengths. She recounted in great detail the Evaluation Team's findings and noted the strengths of each offeror's proposal, along with how both plaintiff and intervenor were rated as Outstanding in both Technical Expertise and Risk Mitigation and Management. The CO agreed with the Evaluation Team's findings, and during her best value discussion, she again went through, factor-by-factor, each offerors' proposal discussing their strengths and finding each one Outstanding.

Throughout the CO's discussion, she repeatedly referenced the evaluation scheme from the RFQ, stating, "Price is not expected to be the controlling criterion in the selection, but its importance will increase as the differences between the evaluation results for the other criteria decrease." AR 1561. Although the CO found that, under the Technical Expertise factor plaintiff had nine strengths covering five of eight critical areas under the PWS while intervenor only had five strengths covering four of the eight critical areas, she decided that "[d]espite the differences between [plaintiff]'s proposed technical solutions versus [intervenor]… the variation in pricing was significant enough in determining [intervenor] as the best value to the government." AR 1566. The CO found that she had two Outstanding, comparable proposals that both indicated each offeror would succeed in the given task order. Intervenor's proposal, however, cost $31,450,859.93 less than plaintiff's proposal, a difference of 10.8 percent. While the CO did use "loosey-goosey" language that had no source in the RFQ and therefore no place in her best value determination, we cannot conclude that it had any impact on her decision. As the CO repeatedly stated, price was the differentiating factor here.

III. The Agency Did Not Engage in Unequal Evaluations

Plaintiff's next argument is that the agency did not evaluate the offerors' proposals equally. The crux of plaintiff's argument is that plaintiff and intervenor both proposed to use the same computer programs, Windchill and other commercial-off-the-shelf ("COTS") tools, for the Configuration Management section of the PWS, but only intervenor received a strength for them in its proposal. Plaintiff claims that the failure of the agency to assign it a strength for that aspect of its proposal is arbitrary and irrational. Defendant responds that, while both plaintiff and intervenor did propose using the same programs for Configuration Management, the anticipated uses set out in the two proposals were not "substantively indistinguishable or nearly identical." Def.'s Mot. at 27. Intervenor proposed to use Windchill and the other COTS tools in different ways from plaintiff, meriting the strength it received.

We agree with defendant. "The Federal Acquisition Regulation requires an agency to treat offerors fairly and impartially." *Office Design Grp.*, 951 F.3d at 1372 (citing 48 C.F.R. § 1.602-2(b)). For a protestor to succeed on a disparate evaluation claim, the "protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Id.* The proposed use of Windchill and other COTS tools was not substantively indistinguishable between the two proposals. As defendant noted, intervenor proposed to use Windchill for the analysis of equipment failure data, while plaintiff's proposal contained no such use. The proposals, therefore, are not substantively indistinguishable. Because the agency had a rational basis for distinguishing between the proposals, we will not disturb its decision.

IV. The Agency Did Not Unreasonably Fail to Assign Strengths to Plaintiff's Proposal

Lastly, plaintiff argues that it should have been assigned four other strengths for its proposal. For example, plaintiff claims that it should have been assigned a strength under the PWS's Quality Management requirement that the "contractor… flow all applicable Quality Management System requirements to all team members and subcontractors" because it had exceeded the requirements. AR 167. Defendant responds that plaintiff has not shown how the agency's assignment of strengths was irrational or violated the terms of the solicitation.

As stated before, if an agency's action was reasonable, we cannot interfere. This reluctance to second guess is particularly appropriate when

an agency is assigning strengths to proposals. Plaintiff has not shown how the agency's assignment of strengths to proposals was irrational; it merely reflects disagreement with the assignment. We will not disturb the agency's decision.

## CONCLUSION

Plaintiff argues that the agency erred in multiple ways during the agency's evaluation of the proposals and best value determination, however, it has not shown irrationality or legal error by the agency. Accordingly, plaintiff's motion for judgment on the administrative record (ECF No. 21) is denied. Defendant's and intervenor's motions for judgment on the administrative record (ECF Nos. 23, 24) are granted. The Clerk of the Court is directed to enter judgment for defendant.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge
